# No. 21-30451

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

OCHEOWELLE OKEKE, DOCTOR
Plaintiff-Appellant

V.

ADMINISTRATORS OF
TULANE EDUCATIONAL FUND
Defendant-Appellee

---

On Appeal
From the United States District Court, Eastern District of Louisiana
Civil Action 20-0450 Section E
District Judge Susie Morgan

---

## BRIEF OF APPELLANT, OCHEOWELLE OKEKE

VASQUEZ LAW
Jessica M. Vásquez
400 Poydras Street
Ste. 900
New Orleans, LA 70130
Tel: 504/571.9582
Fax: 504/684.1449
jvasquez@vasquezlawoffice.com
*Attorney for Ocheowelle Okeke*
*Plaintiff-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the Judges of this Court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
| --- | --- |
| The Administrators of the Tulane Educational Fund | Julie D. Livaudais, and the law firm of Chaffe McCall, L.L.P. |
| | Douglas L. Grundmeyer, and the law firm of Chaffe McCall, L.L.P. |
| | Rosalie M. Haug, and the law firm of Chaffe McCall, L.L.P. |

| Appellant: | Counsel for Appellant: |
| --- | --- |
| Ocheowelle Okeke | Jessica Vasquez |

   __/s/ Jessica M. Vasquez_____
*Attorney of Record for Plaintiff-Appellant*
*Ocheowelle Okeke*

## REQUEST FOR ORAL ARGUMENT

Ocheowelle Okeke, Appellant, requests oral argument to facilitate the decisional process. This appeal raises significant issues of the proper application of case law and interpretation of the factual record at the summary judgment stage, and Plaintiff believes that adjudication of these issues would be aided by oral argument.

# TABLE OF CONTENTS

**REQUEST FOR ORAL ARGUMENT**     **3**

**TABLE OF CONTENTS**     **4**

**TABLE OF AUTHORITIES**     **5**

**JURISDICTIONAL STATEMENT**     **8**

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**     **9**

**STATEMENT OF THE CASE**     **10**

1. Background     10

2. Okeke was Treated Less Favorably Than White Residents     11

3. Specific Instances of Discrimination     12

4. Discriminatory Actions Affected Employment Agreement.     15

5. Scheduling Practices Affected Black Residents     18

**ARGUMENT**     **24**

1. Standard of Review     24

2. Summary Judgment Standard     25

3. District Court Improperly Dismissed Disparate Treatment Claim     26

    A. Direct evidence Okeke was treated unfavorably because of race.     27

    B. Circumstantial evidence Okeke was treated unfavorably because of race.     30 / 30

    C. Wiese's schedule changes caused adverse actions.     33

4. District Court Improperly Dismissed Hostile Work Environment Claim     36

5. District Court Improperly Dismissed Disparate Impact Claim     38

    A. Facially Neutral Employment Practices     39

    B. Disparate Effect On Black Women     41

    C. Causal Connection     44

**CONCLUSION**     **47**

**CERTIFICATE OF SERVICE**     **49**

**CERTIFICATE OF COMPLIANCE**     **50**

**TABLE OF AUTHORITIES**

| CASES | PAGE |
|---|---:|
| | |
| *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)* | **25** |
| *Auguster v. Vermilion Par. Sch. Bd., 249 F.3d 400, 405 (5th Cir. 2001)* | **29** |
| *Banks v. E. Baton Rouge Parish Sch. Bd., 320 F.3d 570, 575 (5th Cir.2003)* | **33** |
| *Bender v Miami Shores Vill, Mun. Corp. (11th Cir. 2014)* | **34** |
| *Brown v. CSC Logic, Inc., 82 F.3d 651, 655 (5th Cir.1996* | **29** |
| *Bulko v. Morgan Stanley DW, Inc., 450 F.3d 622, 624 (5th Cir.2006)* | **25** |
| *Bunch v. Bullard, 795 F.2d 384, 395 (5th Cir. 1986)* | **44** |
| *Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006)* | **33** |
| *Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1231 (11th Cir. 2006)* | **36** |
| *Craddy v. Liberty Nat'l Bank Trust Co. of Ind., 993 F. 2d 132, 136 (7th Cir. 1993)* | **34** |
| *Criner v. Tex.-N.M. Power Co.470 Fed.Appx. 364, 370 n. 3 (5th Cir.2012).* | **43** |
| *Feingold v. New York, 366 F.3d 138 (2d Cir. 2004)* | **34** |
| *Fierros v. Texas Dep't of Health, 274 F.3d 187, 190-91 (5th Cir. 2001)* | **26** |
| *Garcia v. Woman's Hospital of Texas, 97 F.3d 810 (5th Cir.1996)* | **45-46** |
| *Gillis v. Louisiana, 294 F.3d 755, 758 (5th Cir. 2002)* | **27** |
| *Goudeau v. Nat'l Oilwell Varco, L.P., 793 F.3d 470, 475-476 (5th Cir. 2015)* | **31-32** |
| *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)* | **37** |

| | |
|---|---|
| *Harville v. City of Houston, Miss.*, 945 F.3d 870, 874 (5th Cir. 2019) | **45** |
| *Hunt v. Rapides Healthcare System, L.L.C.*, 277 F.3d 757, 764 (2001) | **27, 33** |
| *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013) | **26** |
| *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co*, 930 F. 3d 660, 665 (5th Cir. 2019) | **47** |
| *Laxton v. Gap Inc.*, 333 F.3d 572, 584 (5th Cir. 2003) | **31-32** |
| *Lemaire v. Louisiana Dept. of Transp.*, 480 F.3d 383 (5th Cir. 2007) | **24** |
| *McClain v. Lufkin*, 519 F.3d 264 (5th Cir. 2008) | **40** |
| *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) | **30** |
| *Morris v. Equifax Info. Servs., L.L.C.*, 457 F.3d 460, 464 (5th Cir.2006) | **24** |
| *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) | **37** |
| *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) | **30** |
| *Page v U.S. Industry*, 726 F.2d 1053 (5th Cir. 1984). | **44** |
| *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281–82 (5th Cir.2004) | **33** |
| *Piazza's Seafood World, L.L.C. v. Odom*, 448 F.3d 744, 752 (5th Cir.2006) | **25** |
| *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 313 (5th Cir. 2004) | **32** |
| *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir.2012) | **29** |
| *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) | **26** |
| *Rodriguez v. Eli Lilly &amp; Co.*, 820 F.3d 759, 32 A.D. Cases 1241 (5th Cir. 2016) | **30** |
| *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000) | **31** |
| *Stewart v Miss. Transp. Comm'n*, 586 F. 3d 321 (5th Cir. 2009) | **37** |

| | |
|---|---:|
| *Shepherd v. Comptroller of Public Accounts of the State of Texas, 168 F.3d 871, 873 (5th Cir. 1999)* | **36** |
| *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 135 S. Ct. 2507, 2523 (2015)* | **45** |
| *Thompson v. City of Waco, 764 F.3d 500 (5th Cir. 2014)* | **33** |
| *Thornbrough v. Columbus & Greenville R.R. Co., 760 F.2d 633, 639 (5th Cir. 1985)* | **30** |
| *Turner v. Kan. City S. Ry. Co., 675 F.3d 887 (5th Cir. 2012)* | **32** |
| *United Fire & Cas. Co. v. Hixson Bros., Inc., 453 F.3d 283, 285 (5th Cir.2006)* | **25** |
| *U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 713-14 n.2 (1983)* | **32-33** |
| *Vaughn v. Edel 918 F. 2d 517 (5th Cir. 1990).* | **28-30** |
| *Waisome v. Port Auth. of N.Y. N. J, 948 F.2d 1370, 1376 (2d Cir. 1991)* | **43** |
| *Wheeler v. BL Dev. Corp., 415 F.3d 399, 405 (5th Cir. 2005)* | **26, 27** |
| *Woods v. Delta Beverage Grp., 274 F.3d 295, 298 (5th Cir. 2001)* | **36** |
| | |
| **STATUTES** | **PAGES** |
| | |
| 23 U.S.C. §1331 | **8** |
| FED. R. CIV. P. 56(c) | **25** |
| 42 U.S.C. § 2000e-2 | **34, 40** |
| Fed. R. App. P. 4(a)(1)(A) | **8** |
| Fed. R. App. P. 26(a)(1)(C) | **8** |
| Federal Rules of Evidence 404(b)(2) | **32** |
| Federal Rules of Evidence 701 | **39** |

## JURISDICTIONAL STATEMENT

**1. Basis of the district court's jurisdiction.**

This is an appeal from a final judgment in a civil action by Ocheowelle Okeke against The Administrator of the Tulane Educational Fund ("Tulane").The Complaint alleged Title VII causes of action. The Eastern District of Louisiana had jurisdiction under federal question 23 U.S.C. §1331.

**2. Basis of this Court's appellate jurisdiction.**

On September 30, 2020 the district court entered two orders granting Tulane's Motions for Summary Judgment. (ROA.916-940 and ROA.1206-1221). The Court issued a final judgment on June 28, 2021. (ROA.1222).

Ocheowelle Okeke filed a notice of appeal on July 27, 2021. (ROA.1238). This notice was timely under Fed. R. App. P. 4(a)(1)(A) and Fed. R. App. P. 26(a)(1)(C).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

A.      Whether the district court erred in dismissing Appellant's Title VII disparate treatment claim for failing to establish direct evidence of discriminatory intent when genuine issues of material fact exist as to credibility of the discriminatory statements.

B.      Whether the district court erred in dismissing Appellant's Title VII disparate treatment claim for failing to establish a prima facie case under the McDonnell Douglas framework when genuine issues of material fact exist as to whether Appellant suffered an adverse employment action and as to whether similarly situated employees outside of Appellant's protected class were treated more favorably than Appellant.

C.      Whether the district court erred in dismissing Appellant's Title VII hostile work environment claim based on its finding that Appellant's program director's ongoing and persistent race-based bullying and abusive conduct over a period of four years was not "severe or pervasive" as a matter of law, when genuine issues of material fact exist.

E.      Whether the district court erred in dismissing Appellant's Title VII disparate impact discrimination claim for failing to establish a prima facie case with respect to neutral employment practices, disparate effect, and causation.

**STATEMENT OF THE CASE**

**1.    Background**

Dr. Ocheowelle Okeke ("Okeke") is a Black physician who attended Tulane's Meds-Peds residency program until graduation in 2018.[1] Tulane has both three year residency programs and combined residency programs where residents do a longer four year residency (2 years in each program) and take the board exam in more than one program.[2] The Accreditation of Council for Graduate Medical Education ("ACGME") provides the program requirements for residency programs.[3] Okeke was seeking board certification in both Internal Medicine and Pediatrics through the "Meds-Peds" program and did two years in the Internal Medicine program and two years in Pediatrics program.[4] Dr. Jeffery Wiese ("Wiese") is the Designated Institutional Official ("DIO") and oversaw Internal Medicine, the combined Meds-Peds, and Pediatrics programs and was also the program director for Internal Medicine during this time frame.[5]

As Okeke rotated through her two years in the Internal Medicine program, almost all of the residents and the program director were White.[6] The Meds-Peds

---

[1] ROA.600
[2] ROA.326
[3] ROA.327; ROA.705
[4] ROA.325-326
[5] ROA.598; ROA.615; ROA.701
[6] ROA.678-691

program director, Dr. Princess Dennar ("Dennar"), was the first Black woman program director and was able to achieve, for the first time, an all minority all female incoming resident class in the combined Meds-Peds 2014 program which included Okeke.[7] Dennar has testified that certain acts committed upon Okeke and the other Black female Meds-Peds residents were motivated by race.[8]

## 2.    Okeke was Treated Less Favorably Than White Residents

Dennar testified that Okeke and other Black female residents were given harder rotations, denied training required for graduation, and were given unequal educational and employment experiences by Wiese during their Internal Medicine rotation as compared to the White Internal Medicine residents.[9]

Dennar, as the program director for Meds-Peds should have had the authority to make decisions regarding her residents including scheduling and setting forth requirements for graduation.[10] Wiese usurped Dennar's authority which ultimately affected Okeke's Internal Medicine schedule, her ability to meet her graduation requirements, and ultimately her employment conditions.[11]

For example, Wiese, using his authority as DIO, stopped Okeke from completing four weeks of the Emergency Department rotation rather than allowing

[7] ROA.600-603
[8] ROA.603-605
[9] ROA.602; ROA.610; ROA.625-627; ROA.653
[10] ROA.610-611; ROA.626
[11] ROA.626; ROA.653

their program director, Dennar, to make that decision with her residents.[12]  Wiese disputes that he controlled the residents' schedule.[13] Documentary evidence exists stating Wiese controlled Okeke's schedule and made changes to the detriment of Okeke and other Black female residents who received objectively harder work rotations and less training than promised in the employment contract.[14]

### 3.   Specific Instances of Discrimination

Okeke and other Black female residents had objectively harder rotation schedules during the Internal Medicine rotation than their Internal Medicine White counterparts as proven by the "AMION" schedules.[15] AMION schedules show the entire 4 year schedules for all residents in rotating in Internal Medicine.[16] Okeke and the other Black females received more difficult rotations labeled "Orion[17]" and "Gemini" then their White counterparts and received less time to take training based electives.[18] They were unable to meet their requirements as set forth by their program director who ultimately certifies their ability to graduate.[19] However,

---

[12] ROA.620
[13] ROA.700
[14] ROA.621-622
[15] ROA.739-747
[16] ROA.739-747
[17] ROA.628-629
[18] ROA.739-747;  Electives are required by the ACGME but Plaintiff was put to work on call the days she was able to schedule electives as shown in the schedule.
[19] ROA.608

Dennar was instructed by Wiese to certify Okeke for graduation in his capacity as Dennar's supervisor and DIO without these requirements.[20]

During Okeke's application for residency, Dennar testified that a White faculty individual made an assumption that Okeke failed her STEPS[21] and that very often when this White faculty sees a Black face appear on the screen during an applicant review this would be a disparaging assumption he would make which is what occured to Okeke.[22]

Further, after the "match," meaning that the residency programs find out which incoming interns will be coming to Tulane, Dennar would receive congratulations from Wiese and the chairman.[23] In Okeke's incoming class, the residents were four Black females (including Okeke), one Hispanic and one Asian and Dennar did not receive congratulations from Wiese or the chairman.[24] In fact, Dennar was told by the White chairman, that in the future they need to review the metric used to rank applicants.[25] Dennar perceived this statement to be racially motivated.[26]

---

[20] ROA.653

[21] "STEPS" is criteria by the United States Medical Licensing Examination needed for residency ranking.

[22] ROA.603-604

[23] ROA.604-605

[24] ROA.604-605

[25] ROA.604-605

[26] ROA.604-605

Further, in an email chain to Nick Verne, the Chairman of the Department of Internal Medicine, Wiese states he is considering reducing the number of Meds-Peds students to four instead of six for the upcoming year because of a "cultural issue that are arising" in the Meds-Peds program.[27]

The following is an excerpt:

> There are also some cultural issues that are arising out of the med-peds program because of, I believe, some excessively elevated expectations (and when those excessively elevated expectations are not met, people are unhappy). Having a more manageable number might allow addressing those expectations.

The use of the phrase "cultural issues arising out of the meds-peds program" along with the knowledge that the Meds-Peds program residents were not White points to racial motivation and is more than an "inference" of discrimination. Although the district court takes the position that Wiese could have been referring to "medical school culture" and assessed the credibility of his statement, it is clear that Wiese was referring to a culture within or arising out from the Meds-Peds program because he stated that.[28]

Other instances include an occasion when Okeke introduced Wiese to a group of medical students interviewing for a residency program. Wiese did not know Okeke's name even though she had attended all his Monday class sessions

---

[27] ROA.748
[28] ROA.748

where Wiese made a point of calling himself "chief" or "coach" and knowing all the names of the residents.[29]

Wiese also left out Okeke's name from an email announcement congratulating all residents who obtained their fellowship.[30] Additionally, when Okeke and other Black female residents complained about the harder rotations, Wiese angrily yelled at Okeke and the Black women residents during a school session and said "the buck stops here," "I control the schedule, and you need to be team players" but made no comments to White residents [31]

In another instance, one of the Assistant Program Directors contacted Dennar and referred to Okeke as being hard to deal with and angry, which Dennar beleived was racially driven in terms of connotations and stereotypes that are typically associated with Black women. When Dennar reviewed Okeke's evaluations, there was nothing that was written in her evaluation that would state that she was angry or hard to deal with.[32]

### 4.    Discriminatory Actions Affected Employment Agreement.

The employment agreement between Tulane and Okeke was year to year and incorporated several terms from Tulane's policy.[33] Tulane had an obligation to have enough professionals to run the program and make sure residents' education

---

[29]  ROA.352; ROA.359
[30] ROA.352; ROA.359
[31] ROA.352; ROA.359; and ROA.748-750
[32] ROA.606
[33] ROA.751-758

experience is not compromised by excessive reliance on residents to fulfill non-physician service obligations and the residents are expected to meet their academic program requirements or they could face termination.[34]

In pertinent part, Section 5 of the contract integrates the policy XIV that states[35]:

> b. Condition for Reappointment. Conditions for the offer of any subsequent training agreement following an initial appointment and for promotion within the program are described in Section XIV of the Manual.

Policy XIV states:[36]

> 1. Residents are expected to meet and adhere to all academic, clinical and professional standards set fo in the institutional, departmental, and residency program requirements. Inadequate performance or unprofessional behavior is grounds for disciplinary action, up to, and including, termination.
> 2. Unprofessional behavior includes. but is not limited to. acting improperly towards patients. supervi

The terms of the contract are clear-*the job terms and conditions are to meet the academic program requirements which are set forth by the program director.* Wiese, by changing the schedules of the Black women residents and giving them harder rotations, caused Okeke and others to fail the contractual obligation of meeting the program requirements and resulted in an adverse change of employment status.

Further, Okeke received a modest stipend so most residents typically make additional income moonlighting at Tulane.[37] The Tulane moonlighting policy is in

---

[34] ROA.751-758 and  ROA.759-763
[35] ROA.751-758
[36]  ROA.759-763
[37]  ROA.650-651

the contract itself as a term.[38] The policy states that "moonlighting is a privilege of employment at Tulane.[39] Residents who choose to moonlight will be monitored by their program director and the moonlighting privilege may be revoked by the program director if he or she feels that the moonlighting is adversely affecting the resident's patient care or education, or is putting the resident at risk for work hours violation or excessive sleepiness/fatigue."[40] The policy also requires that the residents must have written approval of their program director and that they cannot be "forced" to moonlight.[41]

Okeke testified the reason she did not moonlight is because she was not permitted to complete an Emergency Department rotation until her fourth year of residency and it is typically a rotation done in the first or second year of residency as indicated by the ACGME requirements.[42] This lack of training forced her to be unable to moonlight.[43] Dr. Okeke cannot go back and train in emergency medicine now because she is already a fellow.[44] Okeke was not eligible to moonlight until her third year and it was anticipated that she would do her emergency department rotation in her first and second year.[45]

---

[38] ROA.751-758
[39] ROA.759-763
[40] ROA.759-763
[41] ROA.759-763
[42] ROA.334
[43] ROA.336
[44] ROA.336
[45] ROA.650-651

**17**

The contract also provided for vacation and educational leave per the Tulane policy that was incorporated into the terms.[46] The policy indicated that Okeke would receive no less than three weeks of vacation per academic year with additional weeks at the discretion of the residency program. [47]

Okeke was required to use two weeks of vacation time to pay for an "away" rotation unlike a White comparator Michael Gillette, also an Internal Medicine resident.[48]

The contract also required the resident not to violate duty hours.[49] The discriminatory scheduling of harder rotations and less training to Black women residents caused Okeke to be in violation of duty hour rules prohibiting work for more than 80 hours a week- which was a condition of her employment.[50] Having disproportionately harder rotations and less training also meant that Okeke could not complete her program requirements which affected the conditions of her employment per her contract and was an adverse action.

### 5.    Scheduling Practices Affected Black Residents

Okeke and several Black women residents complained to Tulane about their harder schedules and lack of training such as Emergency Department time.[51] Tulane

---

[46] ROA.751-758
[47] ROA.759-763
[48] ROA.345; ROA.638-639
[49] ROA.751-758
[50] ROA.664-666
[51] ROA.630 and ROA.1152

states that the schedule is made through a "snake draft" where the level of training determines who gets to go first in selecting rotations, meaning the more senior residents make rotation selections first.[52] The formal schedule is then officially published on "AMION" , an electronic scheduling program.[53] Between the time of the "snake draft" and formal publication on AMION, the schedule goes to the corresponding program director for review.[54] It is at this point that the subjective actions began to occur.

According to ACGME, the Meds-Peds program director should be the only individual that has authority in figuring out how to meet the specific provisions of the ACGME requirements for Meds-Peds residents.[55] To that end, Dennar would formulate the graduation requirements for her residents so they could attend their scheduling meeting with the chief residents and plan their curriculum using those guides ostensibly in the "snake draft".[56]

Wiese made changes to Okeke's schedule even though Dennar was supposed to manage the schedules for Meds-Peds residents.[57] Wiese' scheduling changes resulted in harder rotations and less training to Okeke and Black women

---

[52] ROA.401-404
[53] ROA.401-404
**[54]** ROA.402-404
[55]  ROA.600-601
[56]  ROA.607-608
[57]  ROA.621-622

residents and hindered their ability to complete all the required ACGME curriculum.[58]

Dennar recalls being told that Wiese was the one that did the schedule for Meds-Peds and she interpreted that to me that she would need to come to him for changes or recommendations for a resident.[59] Dennar's authority to approve Meds-Peds program schedules for residents was taken over by Wiese.[60]

This "subjective" employment practice of Wiese changing schedules and interfering with Dennar's scheduling duties after the snake draft and usurping management of residents' Internal Medicine rotation schedules caused disparate results on Black women residents during their Internal Medicine rotations.

The AMION schedules were published and show the most recent schedules for residents each day.[61]  A review of the AMION schedules, show the following:

Dr. Veronica Johnson, a Black Meds-Peds resident, worked 11.25 months of in-service patient wards when her requirements were 8 months and worked more in-service wards than her White counterparts during her Internal Medicine Rotation. As a result, Dr. Johnson was unable to complete her subspecialty requirement.[62]

---

[58] ROA.628-630; ROA.749-750; and ROA.764-775
[59] ROA.624
[60] ROA.609, ROA.621
[61] ROA.739-747
[62] ROA.771-772

Dr. Chioma Udemgba, a Black Meds-Peds resident, completed only 2 weeks of electives in the first two years of her residency and spent the majority of her first two years doing in-service time which was a harder rotation than her White counterparts during her Internal Medicine rotation.[63]

Dr . Melissa Watts, a Black Meds-Peds resident performed more wards and in-service time than was required under the ACGME and her schedule was more difficult than her White male counterparts in the Internal Medicine rotation. As a result she was unable to complete her Emergency Department rotation which was a requirement.[64]

In the case of Okeke, she also did over the amount of inpatient wards in her two years in Internal Medicine than an Internal Medicine White male resident who did three years in Internal Medicine.[65]

This information is significant because it shows the following[66]:

During Okeke's first year, she worked almost twice as much wards time as her White male counterparts. As shown on the AMION schedule document provided by Tulane, Okeke and her partner worked a  total of 25 weeks of inpatient wards as compared to their White male counterparts who worked 13 and 14 weeks total. During Okeke's second year, she and her partner worked almost twice as

---

[63]ROA.773-774
[64]ROA.749-750
[65] ROA.670-671
[66] ROA.739-747

much wards time as her White male counterparts. As shown on the AMION scheduling document provided by Tulane, Okeke and her partner worked a total of 17 weeks of inpatient wards as compared to their White male counterparts who worked 8 and 9 weeks total. During Okeke's third year (2016 -2017) , she and her partner worked a total of 14 weeks of inpatient wards as compared to their White male counterparts who worked 7 and 9 weeks total. During Okeke's fourth year (2017 -2018), she and her partner worked almost a total of 13 weeks of Geminin and Orion services as compared to their White male counterparts who worked 0 and 4 weeks total.

In sum the AMION schedule shows that over the two years of training in Internal Medicine, Okeke spent up to 31% time on the inpatient wards team and 11% of her time on harder Orion and Gemini service as compared to white males in her program that spent 17. 9% and 20.5 % of time on the inpatient wards team and 3.8 % and 3.2% time on Orion and Gemini services.[67]  The Orion and Gemini teams consisted of working in the hospital daily for two weeks maximum. However Okeke was given three weeks of this service. [68]

---

[67]  ROA.739-747;  ROA.764-770
[68] ROA.739-747;  ROA.764-770

Lastly, Wiese required Dennar to sign off on the graduation certifications even though Okeke and other Black women residents lacked graduation requirements due to his scheduling.[69]

## SUMMARY OF THE ARGUMENT

In the two Orders granting Tulane's summary judgment motions and dismissing Okeke's disparate treatment, hostile work environment, and disparate impact claims, the district court improperly weighed evidence, made credibility determinations, and disregarded genuine issues of material fact in the record that preclude summary judgment on all three claims.

The district court further misapplied Fifth Circuit precedent regarding the "comparator" fourth factor of a prima facie case under the McDonnell Douglas framework relating to the disparate treateement discrimination claim and the "causal" third factor for establishing a disparate impact prima facie case. The court also ignored statistical evidence produced by Tulane and created by a material witness, Dennar.

The district court improperly weighed evidence of adverse employment action and limited its consideration of the record which details the objectively harder Internal Medicine rotations assigned to Okeke and Black women residents.

---

[69] ROA.674

The district court also either failed to consider or limited its consideration of the record which details specific instances of hostile conduct towards Black women residents by Wiese. The lower court improperly limited its consideration to only a handful of incidents while ignoring other incidents reported by Black women and witnessed by Okeke and erroneously held that Wiese's harassment was not sufficiently "severe or pervasive" to establish a hostile work environment claim as a matter of law. These and many other facts in the record establish the required elements of all three claims and create genuine issues of material fact on each claim that preclude summary judgment and require a trial on the merits.

## ARGUMENT

### 1.     <u>Standard of Review</u>

The appellate court reviews a district court's order granting summary judgment de novo. *Lemaire v. Louisiana Dept. of Transp.,* 480 F.3d 383 (5th Cir. 2007) (citing *Morris v. Equifax Info. Servs., L.L.C.*, 457 F.3d 460, 464 (5th Cir.2006)). Summary judgment is appropriate when, after considering the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Bulko v. Morgan Stanley DW, Inc.*, 450 F.3d 622, 624 (5th Cir.2006).

A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In considering a summary judgment motion, all facts and evidence must be taken in the light most favorable to the non-movant. *United Fire & Cas. Co. v. Hixson Bros., Inc.,* 453 F.3d 283, 285 (5th Cir.2006). To avoid summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial. *Piazza's Seafood World, L.L.C. v. Odom,* 448 F.3d 744, 752 (5th Cir.2006).

## 2.    **Summary Judgment Standard**

"Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. A fact is 'material' if, under the applicable substantive law, its resolution could affect the outcome of the action." *Anderson v. Louisiana Dep't of Transportation & Dev.,* 836 F. App'x 304, 306 (5th Cir. 2020) (internal quotation marks and citations omitted).

As this Court has noted, "[t]he Supreme Court [has] emphasized the paramount role that juries play in Title VII cases, stressing that in evaluating summary judgment evidence, courts must refrain from the making of '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts,' which 'are jury functions, not those of a judge.'"

*Fierros v. Texas Dep't of Health,* 274 F.3d 187, 190-91 (5th Cir. 2001) (quoting

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Specifically:

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Reeves*, 530 U.S. at 150-51 (internal quotation marks and citations omitted);

see also *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013) (same).

## 3.    <u>**District Court Improperly Dismissed Disparate Treatment Claim**</u>

To establish a prima facie case of racial discrimination in employment, an

employee must demonstrate that (1) she is a member of a protected class, (2) she

was qualified for the position at issue, (3) she was the subject of an adverse

employment action, and (4) she was treated less favorably because of her

membership in that protected class than were other similarly situated employees

who were not members of the protected class. *Wheeler v. BL Dev. Corp.,* 415 F.3d

399, 405 (5th Cir. 2005). Once an employee has made out a prima facie case, an

inference of intentional discrimination is raised and the burden of production shifts

to the employer, who must offer an alternative non-discriminatory explanation for the adverse employment action. *Id.*

Tulane concedes that Dr. Okeke is a Black female and a member of a protected class and that she was qualified for her employment position so Okeke addressed the remaining third and fourth element which was the focus of the district court's decision.[70]

### A.    Direct evidence Okeke was treated unfavorably because of race.

As set forth in the statement of the case, Okeke has both circumstantial and direct evidence of discrimination. In this case, Wiese, Okeke's supervisor, used the phrase "cultural issues arising out of the meds-peds program" which is more likely than not evidence of discrimination when viewed in a light most favorable to Okeke. [71]

The email string starts with an email from Dennar commenting on being surprised that her Med-Peds program did not match candidates on January 20, 2018.[72] Nick Verne sends an email to Wiese asking to discuss it privately and Wiese then privately comments to Verne on the "cultural" issues he has with Dennar's program.[73] The district court took the position it had to infer

---

[70] ROA.311; ROA.923-935
[71] *Gillis v. Louisiana,* 294 F.3d 755, 758 (5th Cir. 2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.*, 277 F.3d 757, 764 (2001)
[72] ROA.748
[73] ROA.748

discrimination because Wiese testified that he was referring to "medical school culture" and improperly weighed the credibility of Wiese's explanation by opining that the statement "cultural issues arising out of the meds-peds program" was not directly racist.[74]

However, if Wiese was referring to the general "medical school culture", he could have easily said "issues arising out of the meds-peds program" without using the word "culture" which is associated with races and ethnicities. Word choice is intentional and Wiese's explanation at the deposition is not plausible because he was not referring to the "medical school" as a whole in the email, only specifically to the "culture" within Meds-Peds.

In *Vaughn v. Edel*, a Black plaintiff, was treated differently, by not being criticized for her work product and given good reviews because she was Black and her supervisor was concerned about a lawsuit. *Vaughn v. Edel* 918 F. 2d 517 (5th Cir. 1990). Discriminatory animus was proven because of a memorandum to the plaintiff from her supervisor advising her she was "acting" like a "black matriarch" and complained several Black people were visiting her office making her unproductive. *Id.* To avoid a lawsuit the supervisor chose not to criticize her, allowed her merit raises, and good reviews. *Id.* The court found that the treatment, even if not negative, was discriminatory because they would have acted differently

---

[74] ROA.923-935

if she was white. *Id.* The plaintiff was ultimately fired but the court found that the behavior was race-motivated, even if positive, and would tend to deprive the plaintiff of "employment opportunities" or "otherwise" adversely affect her status as an employee. *Id.* (citing 42 U.S.C. §2000e-2(a)(2)).

A jury could reasonably believe that "cultural issues arising out of the meds-peds program" is proof of discriminatory animus especially because of the contradiction between Wiese's deposition and the email statement itself. Direct evidence is not an exception to the prohibition against weighing credibility at the summary judgment stage.

Further, where a plaintiff offers remarks as direct evidence, the court applies a four-part test to determine whether they are sufficient to overcome summary judgment. *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir.2012) (citing *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 655 (5th Cir.1996) ).

To qualify as direct evidence of discrimination, workplace comments "must be '1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.' " *Auguster v. Vermilion Par. Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001) (alterations in original) (quoting *Krystek v. Univ. of S. Miss.,* 164 F.3d 251, 256 (5th

Cir.1999) ). *Rodriguez v. Eli Lilly &amp; Co.*, 820 F.3d 759, 32 A.D. Cases 1241 (5th Cir. 2016).

The use of the phrase "cultural issues arising out of the meds-peds program" relates to race and ethnic groups when viewed in the light most favorable to Okeke particularly because Dennar is also Black and the Meds-Peds program is majority Black.[75] This email was sent during the time Okeke was going to be certified for graduation even though she had not completed all of her requirements.[76] This comment related to an employment decision, namely the reduction of her program.

As in *Vaughn v. Edel,* the question turns on whether Wiese and Tulane would have acted differently if Okeke and the Black residents were White. This question is answered in the affirmative because all the White Internal Medicine students received their full requirement of Emergency Department rotation while Meds-peds residents doing Internal Medicine rotations did not. [77]

B.    **Circumstantial evidence Okeke was treated unfavorably because of race.**

With respect to the circumstantial evidence, under the *McDonnell-Douglas* framework[78], to satisfy this burden, the plaintiff need only make a very minimal showing. *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996)

---

[75] ROA.678-691
[76] ROA.600
[77] ROA.739-747
[78] *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)

(quoting *Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 639 (5th Cir. 1985)). To be relevant evidence in a *McDonnell Douglas* analysis, the comments or conduct must show: "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Goudeau v. Nat'l Oilwell Varco, L.P.,* 793 F.3d 470, 475-476 (5th Cir. 2015). Courts do not "blindly accept the titular decisionmaker as the true decisionmaker." *Laxton v. Gap Inc.,* 333 F.3d 572, 584 (5th Cir. 2003) (quoting *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 227 (5th Cir. 2000)).

As summarized *supra*, Wiese's comments using the word "cultural," the failure to remember Okeke's name, yelling at Okeke and other Black women for complaining about their schedules, and ultimately the assignment of harder rotations to Okeke and other Black women which made them work longer than White males and forced them to sacrifice training and moonlighting indicates discriminatory animus on the part of decisionmaker, Wiese.

White male residents who worked with Okeke between 2014-2018 in the Internal Medicine rotation were both supervised by Wiese and hold the same responsibilities, training to complete residency as illustrated in the AMION schedules and rosters.[79] Thus, they are appropriate comparators as is Michael

---

[79] ROA.678-691

Gillete and Peter Caldwell who was also working with Okeke under the supervision of Wiese during that time. [80] The district court held that Michale Gillete and Peter Caldwell were not an appropriate comparator because Mr. Gillete was enrolled in the Global Health Program and Mr. Caldwell was a Chief Resident.[81] In so doing, the district court applied a "stringent" comparator requirement of showing the employees to be "identical," rather than "nearly identical[82]" and usurped the role of the jury of weighing the evidence to determine whether Okeke and the male residents comparators were "nearly identical." Mr. Caldwell in particular as no time frame was given for when he was "chief" resident.

Okeke also has put forth FRE 404(b)(2) evidence to further establish Wiese and Tulane's discriminatory animus. Incidents with other Black women are probative and admissible.[83] Not only did these women undergo schedule changes by Wiese, but they also complained about the schedules being discriminatory and

---

[80] ROA.671

[81] ROA.932-933

[82] *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 95 Empl. Prac. Dec. (CCH) 44464, 114 Fair. Empl. Prac. Cas. 1044 (5th Cir. 2012)

[83] Under FRE 404(b)(2), evidence of a crime, wrong, or other act "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." See also *Hitt v. Connell*, 301 F.3d 240, 249-50 (5th Cir. 2002) (evidence of discriminatory firing of third parties was admissible as proof of motive in plaintiff's firing).

were yelled at by Wiese during class as indicated in their declarations.[84] The district court did not take into consideration any of this evidence.

The Fifth Circuit has held that evidence of other discriminatory conduct can support establishing under the *McDonnell Douglas* framework a prima facie case of discrimination and pretext. See, e.g., *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475-76 (5th Cir. 2015) (finding that discriminatory remarks and conduct about third parties were relevant evidence to establish a prima facie case under McDonnell Douglas); *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 313 (5th Cir. 2004) (evidence of discriminatory comments relevant to establish prima facie case); *Laxton v. Gap Inc.*, 333 F.3d 572, 583 (5th Cir. 2003) ("An oral statement exhibiting discriminatory animus may be used to demonstrate pretext or … may be used as additional evidence of discrimination."). See also *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 713-14 n.2 (1983) (evidence of a decisionmaker's generalized derogatory remarks about a particular group is relevant and admissible to prove race discrimination).

C.     **Wiese's schedule changes caused adverse actions.**

Lastly, a plaintiff must prove that he or she was subject to an "adverse employment action"—a judicially-coined term referring to an employment decision that affects the terms and conditions of employment. See, e.g. *Pegram v.*

---

[84] ROA.630; ROA.749-750; and ROA.1152

**33**

*Honeywell, Inc.*, 361 F.3d 272, 281–82 (5th Cir.2004); see also *Burlington N. &*

*Santa Fe Ry. Co. v. White,* 548 U.S. 53, 62, 126 S.Ct. 2405, 165 L.Ed.2d 345

(2006) (explaining that the language of Title VII's antidiscrimination provision

"explicitly limit[s] the scope of that provision to actions that affect employment or

alter the conditions of the workplace"). *Thompson v. City of Waco,* 764 F.3d 500

(5th Cir. 2014) "[A]n employment action that 'does not affect job duties,

compensation, or benefits' is not an adverse employment action." *Pegram,* 361

F.3d at 282 (quoting *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575

(5th Cir.2003))." *Thompson v. City of Waco*, 764 F.3d 500 (5th Cir. 2014).

"[A]n employment transfer may qualify as an adverse employment action if

the change makes the job objectively worse." *Hunt v. Rapides Healthcare Sys.*,

LLC, 277 F.3d 757, 770 (5th Cir.2001)" (cited by *Thompson v. City of Waco,* 764

F.3d 500 (5th Cir. 2014)). Thus, if a change makes a job objectively worse, it is an

adverse employment action. Okeke can make *at least a minimal showing* that her

harder workload resulting in lack of material training, lack of moonlighting

compensation opportunity, and loss of vacation time benefit that made the job

objectively worse and is an adverse employment action. Further, the job conditions

are contractually spelled out and Okeke was unable to complete the Meds-Peds

program requirements because of disparate treatment which altered the job

conditions.

Other sister circuits have held that disproportionately heavy workloads are adverse employment actions. *Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004), *Craddy v. Liberty Nat'l Bank Trust Co. of Ind.*, 993 F. 2d 132, 136 (7th Cir. 1993) *Bender v Miami Shores Vill, Mun. Corp.* (11th Cir. 2014)(considering high workload as an adverse employment action when coupled with a proper comparator).

Additionally, the statute, 42 U.S.C. 2000e-2, lends to a consideration of the actual work conditions of the employment[85]:

Black women residents who have heavier workloads than their white male comparators do not have the same "status" as a white male employee who do less work for the same stipend and are consequently deprived of employment opportunities such as Okeke's opportunity to take two more weeks of emergency department training or Dr. Veronica Johnson's opportunity to take her required subspecialty. Tulane argues that Okeke had an opportunity to schedule her emergency department training but Okeke and Dennar both testified that Wiese

---

[85] **(a)Employer practices**

    It shall be an unlawful employment practice for an employer—

    **(1)**to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, <u>terms, conditions, or privileges of employment</u>, because of such individual's race, color, religion, sex, or national origin; or

    **(2)** <u>to limit, segregate, or classify</u> <u>his employees</u> or applicants for employment <u>in any way</u> <u>which would deprive or tend to deprive</u> <u>any individual of employment opportunities</u> or <u>otherwise adversely affect his status as an employee</u>, because of such individual's race, color, religion, sex, or national origin.

controlled the schedule and despite Okeke's request, she was not granted that employment opportunity for emergency room training.[86] Dr. Veronica Johnson also states that Wiese controlled the schedules and she only got 50% of what she requested.[87]

Okeke also had to use an employment benefit, her vacation time, to pay for her work during her "away" rotation which is recommended by the ACGME and for Bereavement leave.[88] Other Internal Medicine White male residents, such as Michael Gillete did not have to use their vacation to pay for their "away" rotation.[89]

Okeke's complaint regarding her deprivation of the contractual privilege of moonlighting but for the discriminatory animus of Wiese is also contemplated by the statute which makes it unlawful to discriminate with respect to a privilege of job. Okeke's compensation was affected because residents are able to do additional work at the Tulane hospital using their Emergency Department training to supplement their modest stipend which is called "moonlighting." Okeke could not moonlight because she lacked the training required due to the race-based actions of giving her a heavier workload which prevented her from taking the training. See *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir.

---

[86] ROA.621-622
[87] ROA.749-750
[88] ROA.638-639; ROA.764-770
[89] ROA.342; ROA.638-639

2006) (stating adverse employment actions include decisions altering compensation or causing a significant change in benefits).

## 4.   <u>District Court Improperly Dismissed Hostile Work Environment Claim</u>

In order to establish a hostile work-environment claim, a plaintiff must prove five elements: (1) the employee belonged to a protected class; (2) the employee was subject to unwelcome . . . harassment; (3) the harassment was based on sex; (4) the harassment affected a "term, condition, or privilege" of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Woods v. Delta Beverage Grp.*, 274 F.3d 295, 298 (5th Cir. 2001) (citing *Shepherd v. Comptroller of Public Accounts of the State of Texas,* 168 F.3d 871, 873 (5th Cir. 1999) (footnote omitted))

"Whether an environment is hostile or abusive depends on a totality of circumstances, focusing on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance." Id. (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

In order to satisfy this standard, conduct "must be 'sufficiently severe or pervasive [so as] to alter the conditions of . . . employment and create an abusive

working environment.'" *Stewart v. Miss. Transp. Comm'n,* 586 F.3d 321, 330 (5th Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116 (2002)).

Okeke testified to several interactions with Wiese over four years that created a hostile work environment. As set forth *supra*, Okeke was yelled at by Wiese for opposing the discriminatory schedule, she was subjected to a harder work schedule, Wiese failed to remember her name in front of an incoming class, and Wiese omitted her from congratulatory emails regarding matches.

Additionally, white faculty made negative assumptions about her qualifications during her applicant interview and an Assistant Program Director used stereotypical words associated with Black women when describing Okeke.

Further, when looking at the totality of the circumstances, it is clear that Okeke spent most of her time working harder than White males and missing essential training she needed. These actions over four years is a form of abuse as no employee should have to work harder simply because they are Black women.

This harassment affected her job requirements including the ability to meet her academic requirements. When she complained to her program director, Dennar in turn reported it to her supervisor, Wiese, and was consequently discriminated against herself.[90] Dennar provided reports of the discriminatory scheduling to

---

[90] ROA.668

Tulane but Tulane did nothing to remedy the situation until Okeke left.[91]  The totality of the circumstances supports a finding of a hostile work environment.

## 5.    District Court Improperly Dismissed Disparate Impact Claim

The district court dismissed the claim because it found that the documents produced by Tulane of Dennar's analysis were not properly submitted as an expert report even though Tulane did not argue this point.[92] Dennar's analysis of the schedules and statistics was produced to Okeke by Tulane, thus it is not Okeke's summary computation in her declaration which is solely relied upon.[93] A layperson can offer witness opinion testimony as long as it is rationally based on the witness's perception.[94]  Thus, an expert is not needed to understand the schedule particularly when Dennar has firsthand knowledge as she was the Meds-Peds program director and has the capacity to read a schedule as most laypersons .

### A.    Facially Neutral Employment Practices

Tulane states that the schedule is made through a "snake draft" where the level of training gets to go first in selecting rotations, meaning more senior residents make rotation selections first.[95]  At some point the formal schedule is

[91] ROA.1102-1126
[92] ROA.1102-1126; ROA.1217,
[93] ROA.1103-1108; ROA.764-770; and ROA.737-747
[94] Federal Rules of Evidence 701
[95] ROA.401

officially published on "AMION" an electronic scheduling program.[96] Between the time of the "snake draft" and formal publication, the schedule goes to the program director for review.[97]

Wiese made changes to Okeke's Internal Medicine rotation schedule even though Dennar was supposed to manage schedules for Meds-Peds residents.[98] Wiese' scheduling changes resulted in harder rotations and less training to Okeke and Black female residents and hindered their ability to complete all the required ACGME curriculum.[99]

Dennar recalls being told that Wiese was the one that did the schedule for Meds-Peds and she interpreted that to me that she would need to come to him for changes or recommendations for a resident.[100] Dennar's authority to approve Meds-Peds program schedules for residents was taken away by Wiese.[101]

This "subjective" employment practice of Wiese 1) changing schedules 2) interfering with Dennar's scheduling duties *after* the snake draft and 3) usurping management of residents' Internal Medicine rotation schedules caused disparate results to schedules for Black females residents during  their Internal Medicine rotations.

---

[96] ROA.404
[97] ROA.404
[98] ROA.621-622
[99] ROA.628-630; ROA.749-750; ROA.764-775
[100] ROA.624
[101] ROA.609, ROA.621

The AMION schedule shows that over the two years of training in Internal Medicine, Okeke spent up to 31% time on the inpatient wards team and 11% of her time on harder Orion and Gemini service as compared to White males in her program that spent 17. 9% and 20.5 % of time on the inpatient wards team and 3.8 % and 3.2% time on Orion and Gemini services.[102]   The Orion and Gemini teams consisted of working in the hospital daily for two weeks maximum. Okeke was assigned three weeks of this service. [103]

Title VII provides that "if the complaining party can demonstrate to the court that the elements of [the employer's] decision making process are not capable of separation for analysis, the decision making process may be analyzed as one employment practice." *McClain v. Lufkin*, 519 F.3d 264 (5th Cir. 2008); 42 U.S.C. § 2000e–2(k)(1)(B)(i). Because Wiese' subjective decisions were made without objective criteria and is essentially at his discretion, Okeke has identified these practices as one sufficient to prove a prima facie case.

B.    Disparate Effect On Black Women

Pediatrics and Internal Medicine programs had less than one percent Blacks in their program and fewer women in total than Meds-Peds even though Meds-Peds was a smaller program.[104] Tulane can not dispute that the Meds-Peds

---

[102] ROA.1103-1108; ROA.764-770; and ROA.737-747
[103] ROA.739-747;  ROA.764-770
[104] ROA.678-691; ROA.1067-1068

residents were equally Internal Medicine residents and Pediatric residents because the combined program required each resident to do two years in each program effectively making them residents of both programs.[105] Regardless of the combined nature of the program, each resident was in either Internal Medicine or Pediatrics at any given time.

Wiese's employment practices applied to the programs he supervised and disproportionately affected Black women who were rotating through their Internal Medicines schedules within their Meds-Peds program while being under the supervision of both Wiese and Dennar.[106]

Okeke and other Black women rotating through Internal Medicine had harder rotation schedules than White males rotating through the Internal Medicine program as proven by the "AMION" schedules.[107] AMION schedules show the entire year schedules for all residents in all programs under Wiese from 2014-2018.[108] Okeke and other Black women received more difficult rotations labeled "Orion" and "Gemini" than Whites and received less time to take training.[109] Thus, they were unable to meet their requirements as set forth by the Meds-Peds program director who ultimately certifies their ability to graduate.[110] Dr.

---

[105] ROA.773-775; ROA.652; ROA.1067-1068
[106] ROA.1067-1068
[107] ROA.739-747
[108] ROA.739-747
[109] ROA.739-747-Electives are required by the ACGME but Plaintiff was put to work on call the days she was able to schedule electives and as a result got less elective time.
[110] ROA.771-775

Melissa Watts, Dr. Veronica Johnson, and Dr. Chioma Udembga, who were Black women in the Meds-Peds class rotating through Internal Medicine, did not meet one or more of their requirements for graduation.[111]

As cited above, the AMION schedules are published and show the most recent schedules for residents each day.[112]  The data indicates that Okeke and other Black women doing their Internal Medicine rotation disproportionately received more inpatient wards and harder rotations and were unable to complete their requirements for graduation resulting in educational inequality by race and gender.[113]

These conclusions are the same conclusions reached by Dennar in her analysis of the schedules which compared the schedules of her black female residents on Internal Medicine rotations with while male residents in Internal Medicine and how they measured up to the ACGME requirements.[114] Dennar advised both Tulane and the ACGME of these findings and Dennar's analysis was produced by Tulane in this case.[115]

There is no minimum statistical threshold requiring a mandatory finding that a plaintiff has demonstrated a violation of Title VII. Courts should take a "case-by-case approach" in judging the significance or substantiality of disparities,

---

[111] ROA.749-750; ROA.771-772; ROA.773-775
[112] ROA.739-747
[113] ROA.1103-1108; ROA.764-770; and ROA.737-747
[114] ROA.1102-1126
[115] ROA.1136-1142; ROA.1143-1148.

one that considers not only statistics but also all the surrounding facts and circumstances. *Waisome v. Port Auth. of N.Y. N. J*, 948 F.2d 1370, 1376 (2d Cir. 1991) (cited by *Criner v. Texas New Mexico Power Company*, CIVIL ACTION NO. H-09-3859 (S.D. Tex. Apr. 25, 2011); *see also International Bhd. of Teamsters,* 431 U.S. at 340, 97 S.Ct. at 1857 (statistics "come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances").

Plaintiff requests a case-by-case approach of the surrounding facts and circumstances including 1) Dennar's analysis of the schedules of her residents[116], 2) the employment practices of Wiese[117] 3) Okeke's summary analysis in her declaration regarding the schedules for all residents under Wiese[118] and 4) the affidavits of the other Black women adversely impacted by these circumstances[119].

"A plaintiff may use statistical as well as non-statistical evidence in establishing a prima facie case of disparate impact." *Page v U.S. Industry,* 726 F.2d 1053 (5th Cir. 1984). With respect to the selection size, all the three programs were under Wiese but if imposed on a larger work force, would without question provide statistically significant results. *Bunch v. Bullard*, 795 F.2d 384, 395 (5th Cir. 1986). At the prima facie stage, the court should view all facts and draw all

---

[116] ROA.1102-1126; ROA.1143-1148
[117] ROA.608; ROA.623; ROA.632
[118] ROA.739-747,ROA.764-770
[119] ROA.749-750; ROA.771-772; ROA.773-775

inferences in a light most favorable to the non-moving party. *Harville v. City of Houston, Miss.*, 945 F.3d 870, 874 (5th Cir. 2019). Thus, Okeke has met her burden on a prima facie case of disparate effect.

### C.    Causal Connection

But for these employment practices, Okeke and other Black women residents would not have been impacted with harder schedules and less opportunities for training than White male residents. Even though Wiese received complaints from Black women residents, he continued implementing subjective employment practices such as 1) subjectively modifying resident schedules after chief residents had prepared them and 2) failing to have a system to monitor if schedules are equally implemented by all chiefs and directors to prevent disproportionately affecting Black women residents.[120] Plaintiff has pointed to the practices that caused the disparity as required by *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015).

Further in *Garcia v. Woman's Hospital of Texas*, the Fifth Circuit held that a plaintiff could prove a *prima facie* disparate impact case without statistical evidence and explained that testimony could be sufficient to prove causation. *Garcia v. Woman's Hospital of Texas,* 97 F.3d 810 (5th Cir.1996).

---

[120] ROA.1149-1150

In *Garcia,* the plaintiff attempted to return to her job after complications from pregnancy required her to miss approximately one month of work. Garcia's employer refused to allow her to return to work, on the grounds that her pregnancy disqualified her from being able to lift 150 pounds. The hospital, Garcia's employer, contended that lifting 150 pounds was a *bona fide* job requirement, but admitted that it did not test Garcia's lifting capabilities when she was hired, that it did not test any current employees, and that it also did not test job applicants. *Garcia v. Woman's Hospital of Texas,* 97 F.3d 810 (5th Cir.1996).

Even though Garcia had not provided any statistical comparison demonstrating a disparate impact, the court remanded the case for further proceedings on this issue and held that Garcia did not necessarily have to offer comparative statistical evidence to prove a *prima facie* disparate impact case: "If all or substantially all pregnant women would be advised by their obstetrician not to lift 150 pounds, then they would certainly be disproportionately affected by this supposedly mandatory job requirement for [employees] at the Hospital. Statistical evidence would be unnecessary if Garcia could establish this point." *Id.* at 813.

In this case, Dennar testified and provided a report to Tulane that Black females were being discriminated against by receiving harder rotations over White residents.[121] Dennar testified that all residents should follow ACGME requirements

---

[121] ROA.603; ROA.612-613; ROA.642-643; ROA.1104-1105

for Emergency Department, wards, and subspeciality rotations and that Black women residents who rotated through Internal Medicine were stopped from meeting those requirements.[122]

Dennar analyzed the AMION schedules which does not take specialized skill to understand.[123] The affidavits in this case corroborate the data on the schedules, namely that Black women were given harder schedules and therefore kept from complying with their graduation requirements.[124]

Further, should the Court interpret *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.* as requiring a "preexisting condition" in the context of disparate impact action, then Plaintiff submits more than just a statistical analysis of the rotations in support of causation.[125] Dennar also testified that Black female faculty like herself were not given the same opportunities in terms of mentorship as White male faculty at Tulane and that Black female residents were not given the same opportunities for diverse and educational experience like White male residents at Tulane.[126] In her capacity as the program director, she would have personal knowledge of these opportunities. Dennar was told by the White chairman, her supervisor, that in the future they need to review the metric used to rank

---

[122] ROA.603; ROA.612-613; ROA.642-643
[123] ROA.1104-1105
[124] ROA.749-750; ROA.771-772; ROA.773-775
[125] *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co,* 930 F. 3d 660, 665 (5th Cir. 2019)
[126] ROA.612-613

**47**

applicants.[127] Dennar perceived this statement to be racially motivated.[128] Thus, preexisting conditions exist that would link causation to the statistics.

## CONCLUSION

For the reasons stated above, Ocheowelle Okeke requests that the district court's decision dismissing all claims be reversed and remanded for further proceedings.

VASQUEZ LAW

/s/ Jessica Vasquez
Jessica M. Vásquez
400 Poydras Street
Ste. 900
New Orleans, LA 70130
Tel: 504/571.9582
Fax: 504/684.1449
jvasquez@vasquezlawoffice.com
*Attorney for Ocheowelle Okeke*
*Plaintiff-Appellant*

---

[127] ROA.604-605
[128] ROA.604-605

**48**

# CERTIFICATE OF SERVICE

On October 15, 2021, I caused this brief to be filed electronically with the Clerk of the 5th Circuit Court of Appeal through ECF, which sent an e-mail notice of the electronic filing to the persons listed below.

According to written consent by the parties and Fed. R. App. P. 25(c)(1)(D), I served a copy of the foregoing document to the persons listed below by email:

Julie D. Livaudais
Rosalie Haug
Douglas Grundmeyer
Chaffe McCall
1100 Poydras Street, Suite 2300
New Orleans, LA 70163

/s/ Jessica Vasquez_____
JESSICA VASQUEZ

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.1:  this document contains 9,338 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Google Documents program in size 14 Times New Roman.

/s/Jessica M. Vasquez
Jessica M. Vasquez